Good morning, counsel. Good morning. Whenever you're ready. May it please the court. Good morning. My name is Kyle Cutts. I represent Cedars-Sinai Medical Center and Cedars-Sinai Health System. I'd like to reserve four minutes for rebuttal. These lawsuits challenge Cedars' use of certain technologies on their websites. Cedars operates its website much like it operates its hospital for the benefit of its patients and the communities it serves. But Cedars' website serves another purpose, a federal purpose. Cedars operates its website in furtherance of the government's objective of a nationwide infrastructure of health information technology. So what did the federal government's regulations require this interface with Megapixel? What the federal regulations require. So the federal regulations establish what's known as the Meaningful Use Program. It is now known as the Promoting Interoperability Program. Which is voluntary. Which is voluntary. That's problem one. Nothing was required. Well, participation in the Meaningful Use Program is voluntary, Your Honor. But once a hospital elects to participate in the program, then its requirements are governed by the regulations promulgated by the Centers for Medicare and Medicaid Services. And was one of the requirements that they have an interface with Facebook. That was not a requirement of the regulation, Your Honor. What was required by the regulation is promoting interoperability of health records. And let me explain what that means using some tangible examples. So if I'm a patient at hospital I think we know what it means. We probably all have it for ourselves. But the question still some requirement that you track the use of this interface. That's precisely right, Your Honor. The Meaningful Use Program requires, among other things, for hospitals. But it still doesn't require that you do this by using an interface that then gives information to third parties. Well, what it requires, Your Honor, is that hospitals ensure that its patients are using, downloading, and transmitting their health records. Right. So they need to count how many people are using this interface. It doesn't seem all that complicated. Well, the federal government was concerned that it was quite complicated. In 2004, President Bush issued the executive order that established the position of national coordinator with the goal of encouraging, among other things, greater patient involvement with their health records. The idea behind this was that if you get patients more involved with accessing their health records, using their health records. You're now way back here again. All right. That certainly we understand that the government was trying to promote this. The government promotes many things. It builds highways. It does things that's good to have a good highway system, and so on. That doesn't mean that everybody who participates in any way in what the government is doing is a federal officer. I mean that you're about 100 miles away from there. So we need to know why this all turns you into a federal officer. And Judge Bolton's questions are, I mean, even if they required you to use the pixel, I don't know if that makes you a federal officer. But if they don't require you to use anything like that, that seems to vastly undermine the notion that you're doing this under the supervision of the federal government or for their benefit. Or that the benefit in this case was an incentive, right? The incentive in this case was a payment. Have we ever held that providing this incentive is now turning this into a federal officer? I'm not aware of any case where the court has reached that precise conclusion. Isn't that exactly what the Third and the Eighth Circuits have done in the identical cases? They are similar cases, Your Honor. As I read the Third and the Eighth Circuits, what they're saying is that there's a lack of delegation to the private hospitals from the federal government. And therefore, the private hospitals are not acting under the direction of the federal officers. I think where we disagree with the Third and Eighth Circuit's reasoning is on this point of delegation. Watson holds indeed that formal delegation is one way that a private actor may act under a federal officer. So you want us to create a circuit split if we follow your... That's what you're asking us to do, right? I think that's an inevitability of the decision. There may be some workaround to that, but none occurs to me. So explain to me how they're wrong. They're wrong because formal delegation isn't the end of the story with respect to the acting under provision. Watson goes on to provide that there's other indicia of acting under, including principal-agent relationship, contractual relationship, and payment. And we've pointed to the payment in the form of the incentives here... Because the first two you don't have. We don't have a formal contract. We're not in a principal-agent relationship. I would, however, say, Judge Bolton, that the incentive structure here is akin to a bargain for exchange. The government is searching for creation and operation of the interoperable system of health care technology. It is bargained for the creation of that by private hospitals like Cedars-Sinai through the incentive program and through the... Yeah, I'm not sure just that you get there with just the payment. I mean, see, I can think back. So let's say you have farmers and farmer government at one point, maybe even now, has provided incentives for them to go organic and provides a payment incentive for them to do that. And so they build all, they put all these, plant all these trees, and let's say one of those trees falls on someone, okay? So now, is that farmer somehow an officer, federal officer? Is that what's happening here? Is that what we would... Because that's taking your analysis would get us there, doesn't it? I don't think so because there's more to the story with our circumstance, your honor, and that by that we're building something, we're creating something, and maintaining something that the government has decided it needs and does with fall within a traditional government function. And I'm not sure farming fits within that rubric, but maybe it does. But let me explain the... Say that to the farmers, Kelly. That's fair. The government has decided that this interoperable health network is important. And consider the role the government plays in health care. It's a direct provider to the Department of Defense, the VA, the Bureau of Prisons, just to name a few. Well, let me just ask you a hypothetical. If there were no pay... First of all, as I understand it now, there is no longer a payment. In fact, there's just a penalty. There is no payment. That's correct. The incentive... So does your argument change at that point? No, I don't think so because I think that still, even though there's no payment, the incentive has remained. The bargain for exchange remains such that our participation, we continue to maintain Medicare rates. However, if we fail to be in... So every federal contractor as a federal officer can remove any case that is filed against them with regard to the federal work, even if what they actually did that led to the case had nothing to do with anything they were to do by the federal government. No, I don't think... But that has to be what you're saying. It's not... It's certainly not that every federal contractor acts under the federal officer, but I believe multiple... Why? So how is yours different then? Ours is different. We have supervision under the regulations. We have... We act under... You have no supervision as to what gave rise to this case? Well, I think that goes to the causal connection prong, the causal nexus prong of the federal officer removal statute. And under this court's decision in Leita and De Fiore, the inquiry is whether the private actor committed the alleged offense or was engaged in the conduct because of or while performing the obligations required by the government. And under this, the case law suggests that you should credit the defendant's theory of case. Here, plaintiffs allege that we've disclosed protected health information through the use of these technologies. Our theory of the case is that these technologies were deployed in furtherance of the requirements of satisfaction of the meaningful use program under the causal nexus prong, which this court interprets... This may not be relevant, but specifically why? I'm sorry? Specifically why? And what way was this use of this pixel technology in furtherance of the project? So CEDARS satisfies its requirements under the meaningful use program through the operation of a patient portal, which sits on its website. The traffic that comes to its website, CEDARS deployed these technologies to understand how people operated with its website and to ensure that it was reaching people through its website. I can do that fine, but why is it ending up in the hands of third parties? That has nothing to do with furthering the project. Well, again, Your Honor, the question is whether CEDARS was engaged in the complaint of conduct, which plaintiffs allege was the disclosure of protected... Counselor, you didn't answer her question. Well, let me see if I understand the question. The question is why CEDARS used these technologies? To provide it to a third party. Our position is, Your Honor, we use these technologies in furtherance of... Here, to help us comply with the meaningful use program, to understand how people interacted with our website, to optimize the website. We understand that. We want to know why having a particular technology that ends up in the hands of a third party has anything to do with anything that the federal government is asking you to do. And I think, Your Honor, the answer to that is these technologies help CEDARS use its website better. But couldn't they have just developed it themselves? I mean, why did they have to use a third party as opposed to build it into their own system? Or why does anything that the federal is that... Even if CEDARS wasn't required to use these technologies, I don't know whether or not building it into their own website was even an option or not. But CEDARS used these technologies in furtherance of compliance with the meaningful use program. I don't know if that has answered your question. Probably not, but go ahead. But I see that I've run into my rebuttal time. If there's further questions from the panel now, I'm happy to answer them. Otherwise, I'll reserve the remainder of my time. Thank you, sir. Thank you. Good morning. May it please the Court. Rochelle Bird, Wolf Haldenstein on behalf of plaintiffs at Belize. In this case, California citizens are bringing California state law claims on behalf of a California class against a private California healthcare provider for placing tracking code on its website, which shared its patient's private health information with third parties, such as Meta and Google. The purpose of the federal officer removal statute is to protect federal officers and agents acting within the scope of their authority. Judge Fisher properly remanded this case back to state court, where it's been proceeding ever since. And she did this based on the statute and the record before her. This court should affirm that order for three reasons. One, Cedars was not acting under... I'm sorry? Reading an argument for us is a very bad idea. I'm sorry. There's three reasons under the statute why you should affirm the remand order. One is Cedars was not acting under a federal officer. The second reason is there's no causal connection between what Cedars did and complying with the meaningful use program that was a voluntary program. And third, Cedars doesn't have a colorable federal defense. So I want to start with the first point, that Cedars was not acting under a federal officer. Cedars is a private entity engaged in private conduct. The meaningful use program simply encourages healthcare providers to use electronic health technology for two purposes. Well, it encourages them, incentivizes them by giving them a payment, right? And they indicate that we have to put a lot of weight, but also there were other things that you then had to comply with if you're in the program, that they had to comply with if they were in the program, correct? So initially there was a payment, now there's a penalty as part of participating in the program, correct? But that does not make them an agent of the federal government. It's as if I get a tax credit for buying an electric vehicle, that doesn't make me an agent of the federal government. It's just a way to encourage the behavior that the government wants to see. And counsel pointed to language in Watson, and it's in the briefing as well, that talks about payment. But you have to read that in context. That one sentence is in the context of an agency or employment relationship, and we just don't have that here. If you decide to voluntarily participate in this program as Cedars-Sinai did, do the federal regulations require that there be some type of tracking technology included within the digital medical records so that Cedars-Sinai can report back to the federal government as to how many people are using it, and how often they're using it, and is that part of what the regulations require? Which is what I understand the interface with that the government wants these health providers to develop patient portals so people can access their records, and it wants to know how well they're doing with this. So some sort of evidence of how often a patient goes on to the portal to look at their records, or how often they download or print their records, or how often they send them to a new health care provider, because those are the goals of the program, right? But I saw nothing in the record that said, you should use this type of tracking technology and make sure it transmits private information to third parties like Meta and Google. In fact, the opposite is true. It talks a lot about privacy, and one of the goals of this program, increasing the privacy of electronic technology. But one of Council's arguments, and I understand what they're saying, they're saying, look, this is, and these are my words, but this is like a bridge where we've incentivized someone to build a bridge, cities to build bridges, and then they become federal officers. Why isn't this something big like that? Something, even though it might be something that we're creating in the internet to create these patient portals, this is something substantial the government is asking you to do, and then incentivizing you, and incentivizing them in such a way that they do become federal agents. I don't think encouraging and even highly regulating is enough under the case law. There has to be a contract, an agency, a delegation. The entity has to be doing something that if they didn't do it, the federal government would have to do it themselves. So yes, the government encourages entities to do all sorts of things, like going back to my example, people buying electric vehicles, but that doesn't create the type of relationship that Watson talks about that's key to the federal officer removal statute, and that the purpose of the statute, the purpose of the statute was to not have federal officers and people who were helping federal officers in carrying out their duties be hauled into state court where there may be bias about the federal laws that were in play. None of that is happening here. We're not suing CEDARS over its compliance or non-compliance with the Meaningful Use Program. It's just really unrelated, and I think CEDARS is trying to find something in the Meaningful Use Program that it can point to to say, well, this is why we did this, but there's nothing in the record that would support that argument. Can you tell me what, is there a related regulation that specifically governs the tracking that gave rise to this technology? I understand that it doesn't dictate the technology, but it dictates some sort of tracking. Where is that in the regulation? Are you talking about within the Meaningful Use Program regulations? Yes, I did not see anything in the regulations about tracking technology. I looked at everything. Are they supposed to tell the federal government how many people are using their interface? Is that in the regulations? In their reply papers, they cited a part of the regulation that mentioned something about the government wanting to see a 10% increase in people visiting the portal or something of that nature. That's as close as they get to the government saying, you know, tell us, the government's just basically saying, show us that you're helping people to use their interface. Keep track of how many times people come to the portal and what they do there. Not directly, but that's the implication. But not what they do there. I mean, the complaint here, as I understand it, is that the information that was being collected included what medical information they were accessing and so on. There's nothing in the regulations that deals with that, you're telling me. Right, right. And in fact, the HHS came out and said, you should not be sending this information. Well, but that's sending, but I want to know, is there any obligation to collect it? Collecting? I did not see anything in the regulations about collecting the data and reporting to the government what people are doing on the website. No, I did not see that specificity. But there is some implication that you're supposed to at least be counting how many people are there. There was a citation in their brief to one sentence that talked about a 10% increase of people who are discharged from hospitals. There are all these regulations, though, and they do tell you to do a lot of things. Does it tell you, do any of these, there's 42 CFR, 495.4, say anything about tracking how many people are, or who, or anything like that? I don't believe so, no. I didn't see anything. So I think the main point here is that nothing that the federal government says in the regulations or in the manuals that were included in the record says for CEDARS to provide this information to third parties. And there's no contract here. Council talked about an exchange, a bargain for exchange. I think the government would be surprised to hear that there was some sort of implied contract here. This is a generally applicable voluntary program that people, sorry, healthcare providers can participate in. And if they do, they get, they be reimbursed for all of their Medicare costs if they meet certain requirements. And medical costs with regard to these interfaces? With respect, I think it's Medicare payments in general. That's the penalty is if they don't comply, then they don't get full reimbursement. There's some. So if a healthcare system like CEDARS-Sinai had elected not to do this, their Medicare reimbursements would have been reduced now that they're in the penalty phase as opposed to the incentive phase. I believe that's correct. Yes. Yes. So the other, the second prong of the statute requires causation, some causal connection. I've already talked a little bit about that. The court doesn't even need to go to that second prong if, because the first prong isn't met here. But even if it had been, CEDARS hasn't demonstrated that there's, that it, what it did, I'm sorry, that it's being sued because of its compliance with the Meaningful Use Program or what it did to comply was the reason it was being sued. There's no causal connection there. And that Isaacson in the Second Circuit, that case talks about the conduct that needs to be done because of what the defendant was asked to do by the government. This, the government certainly didn't ask CEDARS to integrate this tracking code into its website and it wasn't necessary. But you're saying more than that. You're saying that the government didn't even ask them to collect this information on its own. I don't think that's part of the Meaningful Use Program. I think the Meaningful Use Program is designed to encourage healthcare providers to adopt certain technology that will allow the patients to access and transport their records. Well, I understand that, but the government might want to know if anybody's actually using this, but you're saying that maybe they want to know that, but they don't, beyond a head count, they don't seem to want any more information about the actual use of these interfaces. That's correct. And, Sir, Price Counsel, you haven't mentioned the Third and Distinguished Circuit. I'm asking you to follow those. That is something I was going to mention in terms of the acting under. The Eighth Circuit in BJC talked about how the design of private websites is not a government concern. It's a private concern. And it's never been a basic governmental task. And the Third Circuit in Moore v. Trustees said the defendant there was doing its own business, not the business of the federal government. So I think those two... Well, hypothetically, if there were a regulation that said that you need to tell the government who's using this and how people with different medical problems are using it and so on, and there was also a showing that to do that you needed some the... And I know this doesn't exist, but that the Cedars-Sinai could not integrate on and so on and needed some third party, then what? Then it would be different? I mean, if they could demonstrate that there was no way to do this except to take some proprietary software, which was going to result in the software getting the information. The software was not required. In order to track activity on a website, you don't have to have the settings such that they'll go to Facebook or Google. And there's other third party vendors who will help you track. There were other vendors, I believe, that work with Cedars and their website to help them understand what's happening. My hypothetical. My hypothetical is that there might be circumstances in which this would absist or prevail, is what you're saying. Well, everything except the sharing part. In fact, I think Facebook's policy say, don't give us PHI, don't give us PII. I just think that Cedars didn't heed that, and it had the pixel on its website. It was set up to transmit the information, and it wasn't necessary. I want to go back to her hypothetical. There are situations where the government could require additional things of folks such that they would sort of fall in line more with that typical control that maybe the Third and the Eighth Circuit have been talking about. There are situations. This is not the situation, but there are situations where the government has direct control and supervision. There are plenty of cases in the briefing where that was the case. There was a contract, or there was some sort of agency relationship, or an employer-employee relationship. But not simply just regulations, complying with the law, the government encouraging people to behave a certain way. That's not enough to get the case. The Medicare relationship is a contractual relationship. I'm sorry, say that again? The Medicare relationship with the government is a form of a contractual relationship, it seems to me. I'm sure there are contracts. And the incentive is a penalty on that relationship. Right. The government wants the Medicare providers. As to the Medicare part of it. Right. Not as to everything else, but as to the Medicare part of it. Right. The government has an interest in making sure its Medicare recipients can access their health records. And so the question is whether, as to that piece, if there were a closer connection between what they were doing and what they were required to do, there might be a federal officer relationship. Yes. If there was direction. Here, I don't see any direction in the record that would fit with the hypothetical that you gave. All right. Thank you, Counsel. Thank you, Your Honors. Go ahead. Thank you, Your Honors. I'd like to turn to the rural electrification cases. These are cases out of the 3rd, 5th, and 11th circuits. These are cases in which the private cooperatives engaged in the creation of electric infrastructure. The federal government realized that there was a lack of electric power reaching rural and underserved communities. It engaged with rural electric cooperatives to provide electricity. Well, they didn't essentially create the cooperatives. I understand they were private organizations, but the federal government almost dictated the creation of those cooperatives. I believe that's correct, Your Honor. But these were nonetheless private cooperatives. They're now private, but they were generated essentially by the federal government to begin with. The federal government did not generate Cedars-Sinai. That's a fair point, Your Honor. By the time these private cooperatives were sued for failing to provide dividends, my understanding is they were clearly operating as private entities. The argument was that they were engaged in a combined federal-private initiative to create infrastructure. Infrastructure creation is part of the meaningful... Counsel, that's completely different than what we have here, isn't it? Respectfully, I don't think so. It's a very different kind of infrastructure, Your Honor. But when I talk about infrastructure, I'm thinking of the creation of digital roads connecting private providers, abilities of hospitals to transmit electronic records to other hospitals to further patient care, and more specifically here through the Meaningful Use Program, the ability of patients to view, download, and transmit their medical records. But none of that is what this case is about. I mean, you keep going back three steps, but this case is about these tracking systems, which is your opponent correct that there is nothing in the regulations that requires such a tracking system? My understanding is there's nothing in the regulations that requires Cedars-Sinai to use the challenge technologies here. No, no, that's not what I'm asking you. Please listen to the question. Is there anything in the regulations that requires tracking? No. What is required is the use, is the reporting to the federal government of how patients view, how many patients view... All right, where is that in the regulations? It's in a few different spots because the regulations have changed over time. For the time period of 2015 to 2018, that's at 42 CFR 495.20. From 2015 to 2018, the requirements are at 42 CFR 495.22. And from 2018 to 2023 and onward, which is stage three of the Meaningful Use Program, that's at 42 CFR 495.24. So Ms. Bird was incorrect when she said it's not in the regulations. Well, I'm trying to... There may be different uses of tracking going on here. I think when Ms. Bird is referring to tracking, she's referring to the technologies like the Facebook Pixel, the Google Analytics, things like that, that they allege are tracking user behavior and reporting protected health information to Facebook. We disagree with that. The regulations are targeted towards ensuring that hospitals understand how patients are using tools like the patient portal to engage in the behavior that the government wants to see, which these view, download, and transmit records. So I think that's a helpful explanation. Meaning that the regulations... I don't have those regulations, I don't think. The regulations require that you count heads in some respect and that you, with regard to what kind of medical care they're accessing and so on. It requires us to report percentages of patients using these tech, engaging in this behavior, a meaningful user of electronic... But not the objected use, which is transmitting this to a third party. That's correct. And I realize... But also not, as you're explaining it, anything specific except that they're using it. Correct. That they're engaging in the behavior... A head count. It's a head count reflected in the percentage of patients that have engaged in the behavior... That engage in using the interface, not how they're using it or what medical issues they're using it for or whether they're using it for appointments or to make inquiries or anything just that they use. That's correct. All right. All right. Are there any other questions? None. Okay. Thank you, Your Honor. All right. Thank you. This matter shall stand submitted.
judges: BERZON, MENDOZA, Bolton